RECEIVED

MAR 3 1 2015

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

SALLY M. SMITH

VERSUS

LAFAYETTE PARISH, ET AL.

CIVIL ACTION NO. 11-1406

JUDGE DOHERTY

MAGISTRATE JUDGE HANNA

### MEMORANDUM RULING

Plaintiff, Sally M. Smith, brings this suit for violations of her constitutional rights pursuant to 42 U.S.C. § 1983, as well as related state law tort claims pursuant to this Court's supplemental jurisdiction, 28 U.S.C. § 1367. The following motions submitted by defendants are now pending before the Court: (1) a Motion for Summary Judgment on behalf of former Lafayette City Marshal Earl J. "Nickey" Picard and Deputy Marshal Jeffrey Mahler (collectively referred to as "the City Marshal defendants") [Doc. 50]; (2) a Motion for Summary Judgment by Lafayette City-Parish Consolidated Government ("LPCG") [Doc. 51]; and (3) a Joint Motion to Strike the Affidavit of Dr. Darrell Henderson by all defendants [Doc. 58]. By their summary judgment motions, defendants seek dismissal of all claims with prejudice. [Doc. 50, p.3; Doc. 51, p.4] Pursuant to their joint motion to strike, defendants move to strike in its entirety the affidavit of Dr. Henderson, submitted in support of plaintiff's motion for summary judgment; alternatively, defendants move this Court to strike paragraphs 7, 10, 14, 15, 16, 19, and 22. [Doc. 58, pp. 1, 2] For the following reasons, the motions for summary judgment [Docs. 50, 51] are DENIED in their entirety; the motion to strike [Doc. 58] is GRANTED IN PART and DENIED IN PART.

## I.     Factual Background

The evidence, viewed in the light most favorable to plaintiff, establishes the following: On September 11, 2010, plaintiff Sally M. Smith was arrested by defendant Deputy Marshal Jeffrey Mahler, of the Lafayette City Marshal's Office, on two counts of resisting an officer and two counts of disturbing the peace. On the evening of her arrest, Ms. Smith had gone out with friends in the downtown Lafayette area. [Doc. 54, p.1] In the very early hours of September 11, 2010, Ms. Smith and her friends were notified that another friend, Milissa Thibodeaux, was walking to her car in the downtown area, intending to drive home, despite being highly intoxicated. [Id.]

Alarmed for the safety of Ms. Thibodeaux, Ms. Smith and another friend, Noah Mudge, began to walk to the area downtown where Ms. Thibodeaux had parked her vehicle. [Id. at 2] At the same time, another friend, Jessica Fruge, got into her vehicle to drive to the location where Ms. Thibodeaux had parked, intending to give Ms. Thibodeaux a ride home in order to prevent her from driving under the influence. [Id.] When plaintiff arrived at the location where Ms. Thibodeaux had parked her car, she saw that Ms. Fruge ("who had gotten to Ms. Thibodeaux before she could drive off") had been pulled over by a Lafayette Police Officer. [Id.] The officer had stopped Ms. Fruge for going the wrong way down a one way street. [Id.]

According to Ms. Smith's version of events, upon arrival at the scene of the traffic stop, Ms. Smith approached Officer Jason Ardoin, of the Lafayette Police Department, who was standing by Ms. Fruge's vehicle. Ms. Smith states she attempted to advise Officer Ardoin of Ms. Fruge's efforts to stop Ms. Thibodeaux from driving while intoxicated, as well as to advise him that Ms. Fruge was Ms. Smith's ride for the evening [Doc. 54-2, p.2; *see also* Doc. 50-3, p. 3] However, before Ms. Smith was able to say anything, Officer Ardoin "yelled for her to 'get the fuck back and leave.'"

[Doc. 54-2, p. 2] Ms. Smith attests although "[s]tartled by the officer's immediate profanities and threatening voice, she again simply tried to provide the officer with information concerning the traffic stop." [Id.] According to Ms. Smith, "[b]efore she could fully form a sentence, Officer Ardoin again yelled for her to leave the area." [Id.] Ms. Smith claims, "The only question that [she] was able to ask Officer Ardoin was where she should go," and he indicated the corner of Polk and Congress streets where Mr. Mudge was already standing. [Id.] Ms. Smith states she immediately complied with the Officer Ardoin's instruction. [Id.] She further attests her "entire interaction with Officer Ardoin lasted less than ten seconds." [Id.]

According to plaintiff, "[i]mmediately thereafter, Lafayette City Deputy Marshal Jeffery Mahler, arrived on the scene," and instantly "began to yell at her and Mr. Mudge, loudly and profanely asking what Sally M. Smith was doing on the corner and demanding her identification." [Id. at 3] Ms. Smith states, "Mahler's anger rapidly increased and began to escalate," as he continued demanding her identification. [Id.] According to Ms. Smith, despite her repeated requests, Deputy Mahler refused to explain why he wanted her identification, but did inform her if she did not produce her license, he would "bring her to jail." [Id.] Ms. Smith then provided Deputy Mahler with her driver's license. [Id.]

Once Ms. Smith produced her identification, Deputy Mahler then ordered her to move to an area in front of his patrol unit, so "he could run her name for warrants." [Doc. 54-2, p. 3] Ms. Smith states she complied and began walking to the front of Deputy Mahler's vehicle. [Id.] Although Ms. Smith offered "no resistance or confrontation," Deputy Mahler "shoved her towards his vehicle despite the fact that she was already walking as directed." [Id.] According to Ms. Smith, "Mahler suddenly and without warning became irate and began to yell at Sally M. Smith that she was under

arrest." [Id.] Deputy Mahler refused to advise plaintiff of the crime for which she was arrested. [Id.]

Ms. Smith asserts Deputy Mahler did not instruct her to place her hands behind her back to be handcuffed, but rather, "forcefully grabbed her by the left arm and wrist, quickly and violently yanking her left arm backwards and behind her back while twisting it upwards and shoving her body forward." [Id. at 3-4] Ms. Smith then "heard a pop and felt immediate severe pain which she later learned was from her left upper humerus 'bicep' arm bone being broken completely in three pieces." [Id. at 4] Deputy Mahler then handcuffed Ms. Smith's broken left arm, "pull[ed] her around by the opposing handcuff and refus[ed] to let her sit down after she had informed him that she was feeling faint and sick as a result of extreme pain caused by the severe injury." [Id.] According to Ms. Smith, at no time prior to the arrest did she "scream, create a disturbance or direct profanity or other offensive, derisive, or annoying words at Mahler, Ardoin or anyone else on the scene of her arrest." [Id. at 4] Ms. Smith was then taken to University Medical Center, where she remained for five hours before being transported to Lafayette Parish Correctional Center ("LPCC"). [Doc. 50-1, p.9] Three hours after her arrival at LPCC, Ms. Smith was released on a misdemeanor summons. [Id.]

According to defendants version of the events in dispute, around 2:00 a.m., Deputy Marshal Jeffery Mahler came upon the scene and saw Officer Jason Ardoin performing a traffic stop on Congress Street. [Doc. 50-1, p.6] Mahler stopped his vehicle to ensure Ardoin did not need assistance. [Id.] At that time, he observed plaintiff "approach Ardoin from behind, but on his right." [Id.] According to the City Marshal defendants, Mahler then "warned Ardoin to 'watch his back' and saw Smith begin to interact with Ardoin within 3-4 feet of the officer." [Id. at 7][1] "Realizing that

_____

[1] In plaintiff's affidavit, she denies that Mahler ever "yelled out to Officer Ardoin" at any time while she approached or was "briefly speaking" to Officer Ardoin. [Doc. 54-2, p.3]

Ardoin needed assistance and having observed what he believed to be the offense of resisting a police officer (*i.e.* interference), Mahler exited his unit and approached Smith with the intention of issuing a misdemeanor citation for the charge of resisting an officer." [Id.] Deputy Mahler requested to see plaintiff's identification and asked her to accompany him to his police unit to perform a warrants check. [Id. at 8] "At some point during the walk to Mahler's police unit, Mahler declared that Smith was under arrest and began to put her arms behind her back in a handcuffing posture." [Doc. 50-10, p.3, ¶ 21] According to Deputy Mahler, "he took Smith's left wrist into his left hand and placed the palm of his right hand above her elbow, on her left triceps [sic] muscle, to perform a soft, empty hand control technique known as M.A.C.H. IV." [Doc. 50-1, p. 20] "During this motion, Smith [and Mahler] heard a loud 'snap' – her left humorous [sic] bone broke." [Doc. 50-10, p. 3, ¶¶ 22, 23] According to defendants, "During his interaction with Smith, Mahler observed what he believed to be signs of intoxication: bloodshot, glossy eyes and the smell of an intoxicating beverage." [Doc. 50-1, p. 8]

Ms. Smith "was charged with two counts of resisting an officer in violation of La. R.S. 14:108 and Lafayette Consolidated Government Ordinance no. 62-66 – one for interfering with Ardoin and one for physically resisting Mahler – and two counts of disturbing the peace in violation of Lafayette Consolidated Government Ordinance no. 62-38(a)(2) by loud and offensive language and (a)(3) by public intoxication." [Doc. 50-1, p. 9] The Lafayette City Prosecutor's Office accepted three of the four charges: disturbing the peace by loud offensive language; disturbing the peace by intoxication; and resisting an officer for physically resisting Mahler. [Id.] The count of disturbing the peace by loud offensive language was subsequently dismissed. [Id.] At trial in the City Court of Lafayette, Smith was found guilty of resisting an officer, in violation of Lafayette Consolidated

Government Ordinance 62-66, and acquitted on the charge of disturbing the peace by intoxication. [Id. at 10; *see also* Doc. 50-8, p.1, n.1] Smith's conviction was affirmed by the 15th Judicial District Court for the State of Louisiana. On September 30, 2013, the Third Circuit Court of Appeal for the State of Louisiana reversed, vacated, and set aside the conviction.[2] [Id.; Doc. 29] Thereafter, "the City Prosecutor sought a review of the ruling either on rehearing or before a 5-judge panel," but the request was denied. [Doc. 29, p.1] The City Prosecutor did not seek a writ with the Louisiana Supreme Court.[3] [Id.]

## II.     Procedural History

On July 29, 2011, plaintiff brought this suit, asserting violations of her constitutional rights, as well as violations of state law. On November 2, 2011, the case was stayed, pending resolution of the underlying state court criminal charges. [Doc. 17] On February 4, 2014, after conclusion of the criminal proceedings, the stay was lifted. [Doc. 30] On February 14, 2014, the Magistrate Judge held a Rule 16 conference, at which all parties agreed to limit discovery to the issue of qualified immunity. [Doc. 33] The Magistrate Judge ordered any summary judgment motions addressing qualified immunity were to be filed no later than August 29, 2014. [Id.; Doc. 35]

On July 21, 2014, the following claims were dismissed pursuant to joint motion of the parties: all claims against Officer Brian Pope, Officer Jason Ardoin and Chief Jim Craft, individually and in their official capacities; all claims against former City Marshal Earl J. "Nicky" Picard in his

---

[2]One judge dissented, stating he "would deny the writ as there is sufficient evidence to support the Defendant's conviction." [Doc. 50-9]

[3]As plaintiff's conviction was reversed on direct appeal, there is no bar to this suit. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

individual capacity; and all claims against Deputy Marshal Jeffrey Mahler in his official capacity. [Doc. 48] The following claims remain pending before the Court at this time: (1) unlawful arrest in violation of the Fourth Amendment by Deputy Marshal Mahler in his individual capacity; (2) excessive force in violation of the Fourth Amendment by Deputy Marshal Mahler in his individual capacity; (3) retaliatory arrest in violation of the First Amendment by Deputy Marshal Mahler in his individual capacity; (4) municipal liability claims against LPCG[4]; (5) wrongful arrest/false imprisonment against Deputy Marshal Mahler pursuant to Louisiana state law, and against City Marshal Picard and LPCG under the doctrine of *respondeat superior*; (6) excessive force/battery against Deputy Marshal Mahler pursuant to state law, and against City Marshal Picard and LPCG under the doctrine of *respondeat superior*; (7) negligent failure to train/supervise pursuant to state law against City Marshal Picard and LPCG; and (8) defamation pursuant to state law.[5] [Doc. 46; *see also* Doc. 50-1, p. 26; Doc. 54, p. 12, n.9] Pursuant to the pending summary judgment motions, defendants now seek dismissal of all claims asserted against them.

---

[4]This claim is asserted against LPCG, as well as former City Marshal Earl J. "Nicky" Picard in his official capacity, and each of those defendants seek dismissal of that claim on the merits. However, the Court notes this claim is actually against LPCG only. *See e.g. Cormier v. Lafayette City-Parish Consol. Government*, 493 Fed.Appx. 578, 581, n.2 (5th Cir. 2012)(Section 1983 suit against Lafayette City Marshal's Office and individual defendants in their official capacities is a suit against LPCG, as official capacity suits represent only another way of pleading an action against an entity of which an officer is an agent)(citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see also Turner v. Houma Mun. Fire and Police Civil Service Bd.*, 229 F.3d 478, 483 (5th Cir. 2000). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham* at 166. "[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.*

[5]Plaintiff does not identify against whom she asserts her claim of defamation. [Doc. 46,p. 10, ¶ 26] The only factual allegation in the Complaint the Court has located bearing on this claim is the following: "False criminal charges were subsequently filed against Petitioner." [Id. at p. 5, ¶ 13]

## III.    Applicable Law & Analysis

### A.    Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at § (c)(1).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.* at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint . . . . Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990) (internal quotation marks and citations omitted).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "[c]redibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverich County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). To the contrary, in reviewing the evidence, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).

### B.    42 U.S.C. § 1983

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992)(citing 42 U.S.C. § 1983). Section 1983 "is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged violation was committed by a person acting under color of state law. *Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008). In this matter, no party disputes that the alleged violations were "committed by a person acting under color of state law."

### C.    Qualified Immunity

Deputy Marshal Mahler asserts should the Court find a constitutional violation occurred with regard to plaintiff's claims of unlawful arrest and excessive force, then he is entitled to qualified immunity with regard to those claims. [Doc. 50, ¶¶ 2, 5]  When a government official abuses his office, an action for damages may be the only realistic avenue for vindication of a petitioner's constitutional guarantees. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). On the other hand, allowing suits for money damages against government officials "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.* The jurisprudence has attempted to accommodate these conflicting concerns "by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could

reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Id.*; *see also Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir.1997)("Qualified immunity shields government officials performing discretionary functions from civil damage liability if their actions were objectively reasonable in light of clearly established law.") "[Q]ualified immunity . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Rocha v. Schroeder*, 283 Fed.Appx. 305, 306 (5th Cir. 2008). There is no immunity if no reasonably competent officer would have thought his conduct was lawful, "but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.*

In the Fifth Circuit:

> When a governmental official with discretionary authority is sued for damages under section 1983 and properly raises the defense of qualified immunity, the plaintiff bears the burden of rebutting that defense. In ruling on a motion for summary judgment based on qualified immunity, the court first determines whether there is evidence to sustain a finding that the defendant's complained of conduct violated plaintiff's constitutional rights. If not, no further inquiry is needed and the defendant is entitled to qualified immunity. If so, the inquiry proceeds to determine whether there is evidence to sustain a finding that under the existing circumstances it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. If not, the defendant is entitled to qualified immunity.

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301–302 (5th Cir.2004) (citations and quotation marks omitted.) In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held the sequential two-step analysis discussed above is no longer mandatory. *Id.* at 821. Instead, lower courts are "permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 818.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* "The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Id.* (internal citation omitted).

### D.      Federal Claims

#### 1.      Unlawful Arrest

##### a.  Applicable Law

Plaintiff asserts her arrest on September 11, 2010 on two counts of resisting an officer and two counts of disturbing the peace violated her rights under the Fourth Amendment to the United States Constitution, because the warrantless arrest was made without probable cause. [Doc. 50-1, pp. 6, 11, 13, 19, 22] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. Amend. IV. The protections of the Fourth Amendment extend to the states via the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979). "In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

"Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Haggerty v. Texas Southern University*, 391 F.3d 653, 655-56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir.2001)). The arresting officer is entitled to qualified immunity if a reasonable officer in his position could have believed that, in light of the totality of the facts and circumstances of which he was aware, there was a "fair probability" that the arrestee committed or was committing an offense. *Haggerty* at 656. "'Fair probability' . . . requires more than a 'bare suspicion' but less than a preponderance of evidence." *U.S. v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001)(quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)).  In evaluating probable cause, courts must apply an "objective standard," meaning courts "will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)(citing *Devenpeck* at 153-54); *see also United States v. Cooper*, 949 F.2d 737, 744 (5th Cir.1991)("Probable cause is determined by an objective test: it cannot be established simply by showing that the police subjectively believed that probable cause existed...."). "If there was probable cause for any of the charges made . . . then the *arrest* was supported by probable cause, and the claim for false arrest fails." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir.1995)(emphasis in original).  The facts supporting probable cause must be known to the officer at the time of the arrest, as "post-hoc justifications based on facts later learned cannot support an earlier arrest." *Club Retro* at 204 (5th Cir. 2009); *Devenpeck* at 152.

**b.  Argument and Analysis**

Defendants argue in this matter, "three judges found sufficient evidence *to convict* Smith of resisting a police officer." [Doc. 50-1, p. 13 (emphasis in original)] "Since the 'quality of evidence required to establish probable cause to arrest is less than that which is necessary to support a conviction,' there is no doubt that Mahler had probable cause to arrest Smith." [Id.] The Court finds this argument is not relevant to the determination of whether plaintiff was subjected to an unlawful arrest on September 11, 2010.  First, the events to which defendants refer took place *after* plaintiff's arrest.  As previously noted, the facts supporting probable cause must be known to the officer at the moment of arrest - "post-hoc justifications based on facts later learned cannot support an earlier arrest." *Club Retro* at 204; *see also Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir. 2000)(state judge's finding of no probable cause at preliminary examination hearing bore no relevance to determining "the reasonableness of the actions taken in light of the cause that existed *at the time of arrest*")(emphasis in original); *Byers v. City of Eunice*, 157 Fed.Appx. 680, 684 (5th Cir. 2005)("rather than operating with the benefit of hindsight, we consider the reasonableness *vel non* of an officer's conduct *at the time of arrest*")(emphasis in original).

Defendants argue, in the alternative, Mahler is entitled to qualified immunity for plaintiff's claim of unlawful arrest. [Doc. 50-1, p. 15] Defendants "recognize that the constitutional right to be free from an unlawful arrest was clearly established at the time of Smith's arrest," and they therefore characterize the qualified immunity inquiry as "turn[ing] on the reasonableness of Deputy Marshal Mahler's actions. . . , particularly, whether he reasonably believed there was probable cause to arrest Smith." [Id.]

Accordingly, the question before this Court is whether there is sufficient evidence to sustain a finding that under the existing circumstances it would have been clear to a reasonable officer that there was probable cause to conclude that plaintiff had committed or was committing the crimes of resisting an officer and/or disturbing the peace. *Johnson*, 379 F.3d at 301 (If defendant's conduct violated plaintiff's constitutional rights, the court must "determine whether there is evidence to sustain a finding that under the existing circumstances it would have been 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted'") (quoting *Saucier v. Katz*, 533 U.S. 194 (2001)). As two distinct offenses formed the alleged basis for the arrest, the Court examines each criminal statute in turn:

### i.   **Resisting arrest**

In support of Deputy Mahler's entitlement to qualified immunity, defendants argue: "Before Mahler exited his police unit, Ardoin explained to Smith that, if she did not back away from the van, as ordered, she would be arrested for interference. . . .  After observing Smith's interaction with Ardoin, Mahler also believed that he was witnessing Smith commit a crime." [Doc. 50-1, p. 16] According to defendants, Ms. Smith was arrested because "she directly inserted herself into Officer Ardoin's traffic stop," and because her "*physical* interference with the traffic stop distracted Ardoin and put his life in danger. . . ." [Doc. 62, p.7 (emphasis in original)]

According to plaintiff, "her only interaction with Officer Ardoin . . . was an attempt to speak with him," she did not "criticize" or "berate" Ardoin, but merely tried "to provide him with information." [Doc. 54, p. 18] Plaintiff asserts her entire interaction with Ardoin was less than ten seconds, she made no physical contact with Officer Ardoin, at no time did she "position herself between Officer Ardoin and Ms. Fruge, instead remaining at least three to four feet away from

Officer Ardoin," and "she immediately walked away once he told her where he would allow her to stand." [Id. at 10, 20]

> La. R.S. 14:108 ("Resisting an officer") provides in pertinent part:
>
> A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

La. R.S. 14:108. Lafayette City-Parish Consolidated Government Ordinance § 62-66 ("Resisting an officer") is identical to La. R.S. 14:108. *City of Lafayette v. Desormeaux*, 967 So.2d 477 (La. 2007).[6]

An unbroken line of Louisiana jurisprudence has restricted the application of La. R.S. 14:108 to "conduct which obstructs officers 'acting in their official capacity, while attempting to seize property, serve process or arrest. . . .'" *State v. Lindsay*, 388 So.2d 781, 783 (La. 1980)(quoting *State v. Huguet*, 369 So.2d 1331 (La. 1979)). "If the officer is not engaged in attempting one of those three things, then a defendant who opposes him cannot be considered guilty of resisting an officer." *Id.*; *see also Adams v. Thompson*, 557 F.Supp. 405, 410 (D.C.La. 1983); *Gann v. Bennett*, 1990 WL 120621, *3 (E.D.La. 1990). "Under dispositive Louisiana jurisprudence, interference with an investigation alone does not constitute interference with an officer in the course of an arrest." *Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir. 1988). Nor does the statute apply to other activities, such as investigating traffic accidents, merely inquiring about name and identification, ordering dispersal of a crowd, or temporarily detaining a suspect for questioning. *See e.g. Adams v.*

---

[6]*See also* http://lafayette-la.eregulations.us/code/coor_ptii_ch62_arti_div2_sec62-66 (last visited March 10, 2015).

*Thompson*, 557 F.Supp. 405 (D.C.La. 1983); *White v. Morris*, 345 So.2d 461, 463-64 (La. 1977);

*Huguet*, 369 So.2d at 1335; and *State v. Grogan*, 373 So.2d 1300, 1302 (La. 1979). "Louisiana

jurisprudence consistently holds that where § 108 is applicable, verbal opposition to an officer, even

abusive language and cursing, does not constitute the 'opposition' and 'obstruction' proscribed by

§ 108." *Adams v. Thompson*, 557 F.Supp. 405, 410 (D.C.La. 1983); *see also Lippert v. Cavaretta*,

1996 WL 159062, *3 (E.D.La.). Rather, any interference must "obstruct[] police in their official

duties in making a lawful arrest, seizure, or service of process." *Huguet* at 1333; *see also Lippert* at

*3; *Lusk v. Roberts*, 611 F.Supp. 564, 569-70 (D.C.La. 1985).

   Illustrative of the foregoing principles is *Brumfield*, 849 F.2d at 153-55.  In *Brumfield*, a

vehicle in which plaintiff was a passenger was pulled over, after police observed what they believed

to be a child who was not secured by a child-restraint device as required under state law. When the

vehicle was pulled over, plaintiff exited the auto on the passenger side and walked to the officers.

According to the plaintiff, he approached the officers, told them he and his wife were attorneys, and

questioned their issuing a citation to the driver. Plaintiff asserted he returned to the auto when the

officers asked him to do so, but admitted "he subsequently expressed his views as to their mental

perspicacity,'" in that he "told his young daughter . . . that if lost she should look for one of the 'big

dummies' in blue." *Id.* at 153, n. 2. The officers contended plaintiff "ignored their repeated requests

to return to the auto and continued to interfere with their attempts to issue a citation to the driver."

*Id*. After plaintiff returned to the vehicle and sat down next to it, the officers issued the driver a

citation for lack of a child-restraint device and for failure to carry proof of insurance in the vehicle.

*Id*. Immediately after plaintiff referred to the officers as "dummies," they called their supervisor.

After discussing the matter with their supervisor, the officers arrested plaintiff for resisting an

officer. *Id.* at 154. Plaintiff brought suit pursuant to § 1983, and the district court granted summary judgment in favor of defendants. The Fifth Circuit reversed, finding under the foregoing contested facts, summary judgment was inappropriate. The Fifth Circuit additionally noted the state court had found that, "at most, [plaintiff] had verbally annoyed officers during the course of an investigation," as at the time of the verbal exchange with plaintiff, the officers had not yet determined whether a violation of the child-restraint statute or proof of insurance statute had occurred, and accordingly, "at that point, no arrest of the driver was in process." *Id.* at 155; *see also Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506, 510 (La.App 1 Cir. 1985)(plaintiff's arrest for resisting an officer by impeding an investigation was unlawful, despite the officers' testimony they were concerned plaintiff had taken a gun from officers' vehicle, but no officer checked to see if the gun was missing to confirm their suspicion).

Viewing the facts of this matter in the light most favorable to plaintiff, at most, Deputy Mahler asserts he observed Smith interacting with Ardoin, with the two being three to four feet apart, while Ardoin was "performing a traffic stop." [Doc. 50-1, p.6; Doc. 50-10, p.2, ¶ 4] According to Officer Ardoin, he was distracted from the driver by Ms. Smith, because she approached him on his right side, which is the side where he holsters his gun. Officer Ardoin told Ms. Smith approximately two times to get back before she complied. Defendants do not state whether or not Deputy Mahler overheard Officer Ardoin's instructions to plaintiff, or whether Mahler was aware Ardoin holsters his weapon on his right side. Thus, this is not a factual scenario where one officer alleges he relied upon information provided to him by another officer as the basis for probable cause. Furthermore, no party has advised the Court whether at the time Ms. Smith began interacting with Officer Ardoin, an arrest of the driver was in progress, or merely an investigation, and if an arrest was in progress,

whether Deputy Mahler was aware of that fact. If Officer Ardoin was still investigating the matter and not "attempting to seize property, serve process or arrest," then arguably probable cause did not exist to believe Ms. Smith was committing the crime of resisting an officer.

Accordingly, the Court finds plaintiff has asserted sufficient facts from which a reasonable factfinder could find that plaintiff's conduct did not fit within the definition of resisting an officer, as defined by statute and Louisiana jurisprudence, and thus, a genuine issue of material fact exists as to whether there was an absence of probable cause for her arrest. With regard to reasonableness, defendants argue Officer Ardoin felt a heightened sense of danger due to plaintiff approaching him too closely on the side on which he holsters his weapon. However, even assuming Mahler was aware of Ardoin's unease, which has not been asserted, the question is not what the officers subjectively felt, but whether reasonable officers in the circumstances at issue would have believed plaintiff was obstructing Officer Ardoin's *arrest* of the driver. In light of the foregoing, the Court finds because the underlying material facts are in dispute, Deputy Marshal Mahler is not entitled to qualified immunity with regard to plaintiff's arrest for resisting an officer.

### ii.  Disturbing the peace

Lafayette City-Parish Consolidated Government Ordinance § 62-38 ("Disturbing the peace") provides in pertinent part as follows:

(a)      Disturbing the peace is the doing of any of the following in such manner as would foreseeably disturb or alarm the public:

. . . .

(2)   Addressing any offensive, derisive, or annoying words to any other person who is lawfully in any street, or other public place; or call him by any offensive or derisive name, or make any noise or exclamation in his presence and hearing with the intent to deride, offend, or annoy him, or to prevent him

from pursuing his lawful business, occupation, or duty; or

(3)     Appearing in an intoxicated condition. . . .[7]

The Court notes the Lafayette Ordinance for disturbing the peace is identical to the state statute for disturbing the peace, found at La. R.S. 14:103. "This crime requires that a 'defendant was disturbing the peace by appearing drunk and in such a manner as would foreseeably disturb or alarm the public.'" *Mesa v. Prejean*, 543 F.3d 264, 271 (5th Cir. 2008)(quoting *State v. Trepagnier*, 982 So.2d 185, 191 (La.Ct.App. 2008)). The phrase "'[i]n such a manner as would foreseeably disturb or alarm the public' has been interpreted to apply only to 'conduct which is violent or boisterous in itself, or which is provocative in the sense that it induces a foreseeable physical disturbance.'" *Netherland v. Eubanks*, 302 Fed.Appx. 244, 247 (5th Cir. 2008)(quoting *State v. Jordan*, 369 So.2d 1347, 1350 (La. 1979)). In order for probable cause to exist under this statute, Louisiana caselaw "requires that an officer observe evidence both of actual intoxication and a likelihood that the public will be endangered or disturbed." *Mesa* at 271 (citing *State v. Stowe*, 635 So.2d 168, 172 n. 3 (La.1994) (probable cause existed "based on defendant's offensive and derisive language in the middle of a public highway, plus his visibly intoxicated condition"); *State v. Chauvin*, 945 So.2d 752, 761–62 (La.Ct.App.2006) (no probable cause because no evidence of actual intoxication and no evidence "the defendant's actions had the intent to deride, offend or annoy the people he approached or that they were violent or boisterous in a manner that would induce a foreseeable physical disturbance")).

---

[7]*See* https://www.municode.com/library/la/lafayette_city-parish_consolidated_government/codes/code_of_ord inances?nodeId=PTIICOOR_CH62OFMIPR_ARTICROFLA_DIV2SPCROFLA_S62-38DIPE (last visited March 10, 2015).

In this matter, the only evidence submitted by defendants to show Deputy Marshal Mahler had probable cause to believe Ms. Smith had committed or was committing the crime of disturbing the peace by intoxication is Deputy Marshal Mahler's testimony that during his interaction with Ms. Smith, he noticed her "bloodshot, glossy eyes," and could smell "the odor of an intoxicating beverage." [Doc. 50-2, p. 24] Deputy Mahler thus concludes he is entitled to qualified immunity for this arrest, as, "Regardless of whether she was, in fact, intoxicated, the officers also shared a reasonable belief, based on their observations and training, that she was both intoxicated and disturbing the peace." [Doc. 50-1, p. 16] According to plaintiff, "no evidence exists to even suggest that Ms. Smith was endangering or disturbing the public," and Deputy Marshal Mahler "had no information that plaintiff was a danger to herself or anyone else at the time he arrested her." [Doc. 54, pp. 21-22]

The evidence before this Court at this time is insufficient to support a finding that based on Ms. Smith's conduct preceding her arrest, a reasonable person could conclude that she was violating the intoxication statute.  Even were this Court to assume for purposes of this motion the evidence submitted is sufficient to show probable cause existed to believe Ms. Smith appeared in an intoxicated condition, defendants have submitted no evidence to show Ms. Smith appeared "in such a manner as would foreseeably disturb or alarm the public." La. R.S. 14:103(a)(3); *Mesa* at 271. Defendants have submitted no evidence or argument that Ms. Smith's conduct was "violent or boisterous in itself," or that it was likely to induce "a foreseeable physical disturbance." *Netherland* at 247. Accordingly, the Court finds Deputy Mahler is not entitled to qualified immunity with regard to plaintiff's arrest for disturbing the peace.

### 2.    Excessive Force

#### a.    Applicable Law

Deputy Mahler asserts he is entitled to qualified immunity with respect to plaintiff's claim of excessive force. [Doc. 50-1, pp. 17-23]   Claims of "excessive force implicate the Fourth Amendment's proscription against unreasonable seizures." *Peterson v. City of Fort Worth. Tex.*, 588 F.3d 838, 845 (5th Cir.2009)(citing *Terry v. Ohio*, 392 U.S. 1, 16, n. 16 (1968)).   A determination of whether "the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham* at 396. As stated by the Supreme Court:

> Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal quotations and citations omitted).

Plaintiff's "excessive force claim is separate and distinct from her unlawful arrest claim," and courts "must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).  In the Fifth Circuit, "the test for qualified immunity in the context of excessive force . . . requires (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999); *see also Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 846 (5th Cir. 2009). "[T]he permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)(citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Deville*, 567 at 168 (internal quotation marks omitted). "Thus, 'the extent of [the] injury inflicted' may be considered in determining whether the officers used excessive force." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). Although the determination of "objective reasonableness" is a question of law, *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998), disputes of material fact prevent a court from determining the objective reasonableness of an officer's conduct, thereby precluding summary judgment. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 451-52 (5th Cir. 1998).

In this matter, there is no dispute that plaintiff suffered an injury during her arrest - *i.e.* a broken humerus. Accordingly, only the second and third elements (*i.e.*, whether the force used by

Deputy Marshal Mahler was clearly excessive to the need, and whether it was objectively

unreasonable) are at issue.

### b. Arguments and Analysis

Defendants argue, "Smith cannot identify any action by Mahler which was excessive,

intentional, or objectively unreasonable." [Doc. 50-1, p. 19]   According to defendants:

> Smith admits that the details are "fuzzy" and she does not know what happened or
> what caused her arm to break, only that the injury occurred as Mahler began to put
> her arms behind her back to effectuate the arrest. She does not know where Mahler's
> hands were at the time, and she cannot explain what she believes Mahler did that
> resulted in her injury.
>
> All Smith knows is that one or both of Mahler's hands were on her, and her
> humorous [sic] bone broke as her arms were going behind her. Smith explained that
> the injury occurred as Mahler made one motion to bring her arms behind her, but
> does not allege that he violently pulled her arms.  She cannot point to any other
> movement or act by Mahler which caused her arm to break.

[Doc. 50-1, pp. 19-20 (footnotes omitted)]

According to plaintiff's version of events, "rather than instructing her to place her hands

behind her back to be handcuffed, Mahler forcefully grabbed her by the left arm and wrist, quickly

and violently yanking her left arm backwards and behind her back while twisting it upwards and

shoving her body forward." [Doc. 54-2, pp. 3-4] Plaintiff then "heard a pop and felt immediate

severe pain which she later learned was from her left upper humorous [sic] 'bicep' arm bone being

broken completely in three pieces." [Id. at 4] Plaintiff contends Deputy Marshal Mahler thereafter

continued to use excessive force "by handcuffing her broken left arm and then pulling her around

by the opposing handcuff and refusing to allow her to sit down after she had informed him that she

was feeling faint and sick as a result of extreme pain caused by the severe injury." [Id.] Additionally,

plaintiff challenges Mahler's assertion he used "a safe soft, empty hand control technique" to

effectuate the arrest. [Id.] Plaintiff notes Mahler attests he has used this technique before and after

Ms. Smith's arrest, and that he teaches this technique at the Acadiana Law Enforcement Training

Academy, and other than Ms. Smith, his use of the technique has never resulted in injury. [Id.; *see*

*also* Doc. 50-6, pp. 1-2] Plaintiff thus concludes:

> Given that plaintiff undisputably had her arm broken during the course of Mahler's
> handcuffing of her and given that plaintiff made no violent movements during this
> process, the reasonable inference which must be drawn is that Mahler did not use a
> safe soft, empty hand control technique. Rather, the inference must be that [Mahler]
> exerted sudden extreme force on plaintiff's arm.

[Id. at 24-25]

Plaintiff asserts the force used was "clearly unreasonable," arguing: (1) the crime at issue

("Mahler was arresting plaintiff for having a conversation with Ardoin which lasted less than ten

seconds and from which plaintiff had walked away prior to Mahler's approach") was not severe; (2)

plaintiff posed no threat to the safety of the officers or others, as she "at no time made physical

contact with either Ardoin or Mahler, made no threatening gestures and was half the size of Mahler";

and (3) "plaintiff did not actively resist arrest or attempt to evade arrest by flight, instead following

Mahler to his police car when directed to do so." [Doc. 54, p. 25] Plaintiff additionally notes Mahler

conceded in his deposition plaintiff had no obligation under the law at that point in the events to

follow him to his vehicle. [Id.] In light of the foregoing, plaintiff argues "any reasonable police

officer in Mahler's position would have understood the unlawfulness of grabbing plaintiff's arm with

a violent and twisting motion sufficient to break plaintiff's humerus bone." [Id.]

Defendants assert this Court should reject plaintiff's affidavit testimony wherein she states

"Mahler forcefully grabbed her by the left arm and wrist, quickly and violently yanking her left arm

backwards and behind her back while twisting it upwards and shoving her body forward." [Doc. 62,

p.5] Defendants argue plaintiff's affidavit, "signed the day before her opposition was filed, . . . contradicts her April 30, 2014 deposition testimony in an effort to create a genuine issue of material fact, where none previously existed, regarding the use of force." [Id. at 1-2] Defendants argue in Smith's deposition, "she did not know where Mahler's hands were or how the injury occurred," and "the most she could testify to was that the injury occurred when her arms were going behind her." [Id. at 2 (footnotes omitted)] According to defendants:

> Smith was directly asked by counsel for the City of Lafayette defendants:
>
> > Q:   The motion that you were showing, you know, that it was the arms behind that back, you don't know where Officer Mahler's hands were, if they were on your biceps or on your wrist or anywhere else on your arm, was there any type of *twisting motion* or anything like that, that you recall?
>
> Contrary to her affidavit, Smith replied:
>
> > A:   *I can't tell you that*. It happened very quickly, and it felt like his hands were all over me. *And I don't know – I can't tell you*.
>
> Now, without any explanation other than that she was not directly asked – which is not correct – Smith asks this court to accept her affidavit testimony that Mahler "quickly" and "violently" "yanked" her left arm backwards and behind her while "twisting it upwards and shoving her body forward" Interestingly, though, when Smith demonstrated the arrest and Mahler's movements during her video deposition, as the court can see, she did not grab counsel's arm and twist it upwards nor did she otherwise show that a quick, violent twist or yank occurred.

[Doc. 62, pp. 2-3 (footnotes omitted; emphasis in original)] Defendants conclude, "It is evident that Smith's new, post-summary judgment affidavit is not merely a supplement to her prior testimony; rather, it is entirely contradictory to her deposition and is a sham attempt to manufacture a material issue where non otherwise exists." [Id. at 4-5]

Defendants are correct that in the Fifth Circuit, "when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict." *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (party may not defeat summary judgment using affidavit that impeaches, without explanation, sworn testimony). However, "[w]hen an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S.* at 496. In this matter, the Court finds plaintiff's affidavit supplements, rather than contradicts, her prior deposition testimony. The Court has reviewed the submitted portions of the deposition testimony, as well as the cited portion of the video deposition, and the only question the Court has located where plaintiff was directly asked about Deputy Mahler's method of arresting her was that quoted above, namely: "The motion that you were showing, you know, that it was the arms behind that back, you don't know where Officer Mahler's hands were, if they were on your biceps or on your wrist or anywhere else on your arm, was there any type of twisting motion or anything like that, that you recall?" This question is problematic, in that it is compound, thus making it impossible to know to which portion of the question plaintiff was responding in her deposition. Indeed, the other questions and responses bearing on this issue which have been provided to the Court focus on which portion of plaintiff's upper limbs Mahler placed his hands in effectuating the arrest. Plaintiff was unable to state where Mahler had placed his hands.

Additionally, plaintiff has submitted the affidavit of expert witness Dr. Darrell Henderson, who "describes in detail the strength of the humerus bone and the sudden extreme force necessary

to cause the fractures plaintiff sustained." [Doc. 54, p. 24] Dr. Henderson conducted an examination of plaintiff on August 22, 2011 (more than one month prior to submission of plaintiff's memorandum in opposition to summary judgment), wherein she informed him Deputy Mahler "forcefully grabbed and manhandled her, and while doing so he twisted her arms around her back. . . ." [Doc. 54-3, p. 3, ¶¶ 7, 9] Dr. Henderson noted plaintiff was not a smoker, had no surgeries prior to this incident, had no prior left arm injuries, and no history of bone disease or hormonal disease causing weakened bones. [Id. at ¶ 9] He further notes plaintiff's radial nerve, "which is in close proximity to the humerus and is actually wrapped around the bone," was bruised at the time of plaintiff's surgery. [Id. at p. 4, ¶ 17] To the extent defendants have moved to strike the affidavit of Dr. Henderson, the motion is denied in part. While the Court recognizes portions of Dr, Henderson's affidavit are impermissible, the Court has relied only upon those assertions set forth and cited in this paragraph. Defendants have lodged no specific objections to that which the Court has cited, other than their argument, addressed above, that plaintiff did not testify at her deposition to any twisting motion. *See e.g. Salas v. Carpenter*, 980 F.2d 299, 304 (5ᵗʰ Cir. 1992) (trial court should only disregard inadmissible portions of challenged affidavit, submitted in support of a motion for summary judgment).

Plaintiff was arrested for relatively minor offenses (*i.e.* resisting an officer and disturbing the peace), at a time when she was standing on a corner (*i.e.* after her alleged criminal conduct ceased), making the need for force substantially lower than if she had been suspected of a more serious crime. According to plaintiff's account, there was no reason to believe her actions posed a threat to the officers, herself, or the general public. No evidence has been submitted that Ms. Smith would attempt to flee or use a weapon. According to Ms. Smith, her resistance was, at most, passive in that

she merely questioned why she was being arrested. Nevertheless, in the course of her arrest, plaintiff's humerus was broken in three places, and her radial nerve was bruised. Taking the facts in the light most favorable to Ms. Smith, a jury could reasonably find that the degree of force Deputy Marshal Mahler used in this matter was not justifiable under the circumstances. *Deville v. Marcantel*, 567 F.3d 156, 167-68 (5th Cir. 2009). Accordingly, the Court finds genuine issues of material fact exist as to whether a reasonable officer would know the force used to effectuate plaintiff's arrest was unreasonable, and thus, Deputy Mahler is not entitled to qualified immunity with respect to plaintiff's claim of excessive force.

### 3. Retaliatory Arrest in Violation of the First Amendment

Plaintiff asserts her arrest "by defendant Mahler was in retaliation for plaintiff's exercise of her rights under the 1st Amendment." [Doc. 46, p. 5, ¶ 14 (emphasis omitted)] Defendants do not assert Deputy Mahler is entitled to qualified immunity for this claim. [Doc. 50, p. 2, ¶ 3] Rather, defendants' entire argument in support of summary dismissal of this claim is: (1) in *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012), the United States Supreme Court held, "'This Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause'"; and (2) because the arrest in this matter was supported by probable cause, "the *Reichle* decision controls and defeats Smith's First Amendment retaliatory arrest cause of action." [Doc. 50-1, p.17 (quoting *Reichle, supra*)] While plaintiff concedes "her 1st Amendment claim would fall if Mahler had probable cause to arrest her lawfully," she asserts, "[a]ccepting plaintiff's account as true, her speech did not rise above inconvenience, annoyance, or unrest, nor did it constitute an incitement to immediate lawless action," and thus, "plaintiff's 1st Amendment claim cannot be resolved on summary judgment." [Doc. 54, pp. 22-23 (citing *Massey v. Wharton*, 477 Fed.Appx.

256, 264 (5th Cir. 2012)]

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id*. at 462-63. "Courts need to be alert to arrests that are prompted by constitutionally protected speech, even when the arrestee's words are directed at a police officer performing official tasks. Trained officers must exercise restraint when confronted with a citizen's anger over police action." *Mesa*, 543 F.3d at 273.

In this matter, the validity of Ms. Smith's First Amendment claim "hinges on probable cause for her arrest – a fact question for the jury." *Id.* Accordingly, this claim cannot be resolved on summary judgment. *Id.* If Officer Mahler had probable cause to arrest Ms. Smith for resisting arrest or disturbing the peace, "there can be no inquiry into whether he was subjectively motivated by her comments." *Id.* (If probable cause exists, any argument the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail). However, if a jury finds there was no probable cause for Ms. Smith's arrest, her First Amendment claim may be considered as well. *Id.*; *see also Enlow v. Tishomingo County, Miss.*, 962 F.2d 501, 509-10 (5th Cir. 1992); *Massey* at 263-64. Accordingly, summary judgment with regard to plaintiff's claim of retaliatory arrest in violation of the First Amendment is denied.

### 4.    Municipal Liability

To succeed on a municipal-liability claim under § 1983, plaintiff "must show an underlying constitutional violation resulting from an official policy." *Sanchez v. Edwards*, 433 Fed.Appx. 272, 276 (5th Cir. 2011)(citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). Plaintiff's

complaint sets forth allegations that the constitutional violations she alleges resulted from official municipal policy. [Doc. 46, ¶¶ 16, 19]

Defendants argue this claim should be dismissed, because "there was no underlying constitutional violation or tort by Mahler." [Doc. 50-1, p. 12; Doc. 51-1, p. 14; Doc. 62, pp. 9-10] Alternatively, LPCG argues it "cannot 'reasonably be said to have been deliberately indifferent' in using Deputy Marshal Mahler, who is not only highly trained, but is an instructor on the exact type of soft, empty hand technique used in this case," and therefore, "there [was] no deliberate indifference to the constitutional rights of plaintiff." [Doc. 51-1, p. 15 (quoting *City of Canton v. Ohio*, 489 U.S. 378 (1989)]

Plaintiff argues the portion of defendants' motion seeking dismissal of plaintiff's municipal liability claims should be deferred, pending additional discovery, pursuant to Fed.R.Civ.P. 56(d).[8] [Doc. 54, pp. 4-5, 26] Plaintiff notes the Magistrate Judge issued an order in this matter limiting discovery to the issue of qualified immunity. [*see* Doc. 35] Additionally, counsel for plaintiff has submitted an affidavit attesting he has "limited discovery to topics related to qualified immunity," in compliance with the Magistrate Judge's order. [Doc. 54-1] Counsel further attests "depositions and other discovery related to the policies, practices and customs of the City Marshal's Office and

---

[8]Rule 56(d) provides:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed.R.Civ.P. 56(d).

that of City of Lafayette-Parish Consolidated Government is essential to plaintiff's ability to oppose any motion for summary judgment relative to plaintiff's *Monell* claims." [Id. at 2]

Rule 56(d) "'allows for further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013)(quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006)). "'Such motions are broadly favored and should be liberally granted.'" *Id.* Because discovery thus far in this matter has been limited to qualified immunity, and qualified immunity has no bearing on the issue of municipal liability, the Court agrees plaintiff should be permitted to conduct discovery on this issue prior to responding to a motion for summary judgment. *See e.g. Trent v. Wade*, 776 F.3d 368, 388-89 (5th Cir. 2015). Accordingly, defendants' motion is denied to the extent it seeks dismissal of plaintiff's municipal liability claims.

### E.       State Law Claims

#### 1.       False Arrest/False Imprisonment

Plaintiff asserts claims of "false arrest" and "false imprisonment" pursuant to Louisiana law. [Doc. 46, pp. 9-10, ¶ 26] Defendants argue dismissal of these claims is warranted, because "Smith's arrest was based on probable cause." [Doc. 50-1, p. 24; Doc. 51-1, p. 10] Plaintiff responds she has shown there was a lack of probable cause for her arrest, and therefore defendants' motion should be denied with respect to this claim. [Doc. 54, pp. 26-27]

"Wrongful arrest, or the tort of false imprisonment, occurs when one arrests and restrains another against his will and without statutory authority." *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 690 (La. 2006). "The tort of false imprisonment consists of the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Id.* Thus,

if "the arrest is made either without any legal process or warrant or under a warrant void and null

upon its face," a false imprisonment has occurred. *De Bouchel v. Koss Const. Co.*, 177 La. 841, 846-

47 (La. 1933); *see also Reese v. City of Baton Rouge*, 644 So.2d 674, 676 (La.App. 1 Cir. 1994).

As plaintiff was arrested without a warrant, Deputy Marshal Mahler "had statutory authority

for the arrest only if [he] had probable cause." *Deville v. Marcantel*, 567 F.3d 156, 172 (5th Cir.

2009).  As plaintiff has raised a genuine issue of material fact with regard to the lawfulness of her

detention, summary judgment on this claim must be denied.

### 2.  Excessive Force/Battery

In support of dismissal of this claim, defendants argue, "Accepting Smith's testimony and

her failure to demonstrate that Mahler used any force or otherwise acted unreasonably under the

circumstances, the Louisiana law excessive force and battery causes of action should be dismissed,

with prejudice." [Doc. 50-1, pp. 25-26; Doc. 51-1, p. 10] In response, plaintiff asserts she has

"conclusively establishe[d] (for purposes of this Motion) . . . the excessiveness of Mahler's force and

thus, . . . battery . . . under Louisiana law." [Doc. 54, p. 27]

With regard to a claim of excessive force pursuant to Louisiana law, the Louisiana Supreme

Court has stated:

> The use of force when necessary to make an arrest is a legitimate police
> function. But if the officers use unreasonable or excessive force, they and their
> employer are liable for any injuries which result.
>
> Whether the force used is reasonable depends upon the totality of the facts
> and circumstances in each case. A court must evaluate the officers' actions against
> those of ordinary, prudent, and reasonable men placed in the same position as the
> officers and with the same knowledge as the officers. The degree of force employed
> is a factual issue.
>
> Several factors to be considered in making this determination are the known

character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Kyle v. City of New Orleans*, 353 So.2d 969, 972-73 (La.1977)(citations omitted). "Louisiana law authorizes only that 'the person making a *lawful* arrest may use reasonable force to effect the arrest and detention.'" *Deville v. Marcantel*, 567 F.3d 156, 173, n.9 (5th Cir. 2009)(emphasis in original)(quoting La. Code Crim. P. art. 220). "If the arrest is unlawful then all force used to effectuate the arrest is excessive and constitutes a battery." *Id.* (internal quotation marks omitted).

As this Court has found a genuine issue of material fact exists as to whether or not probable cause existed for the arrest (and thus, whether the arrest was "unlawful"), summary judgment with regard to plaintiff's state law claim of excessive force is denied.

### 3. Negligent Failure to Train/Supervise

Plaintiff asserts a claim of negligence against defendants for their "negligence in failing to properly train and supervise its officers." [Doc. 46, p. 9, ¶ 25] The City Marshal defendants argue, "Because Smith has no viable cause of action against Mahler, there is no support for her allegation that City Marshal Picard failed to train or supervise him," and therefore, this claim must be dismissed. [Doc. 50-1, p. 26] LPCG argues "Mahler was more than adequately and properly trained." [Doc. 51-1, p. 14]

As the Court has found genuine issues of material fact exist with regard to the claims asserted against Deputy Marshal Mahler, and because the Court has found additional discovery on this issue is warranted, summary judgment is denied with regard to this claim.

### 4.    Defamation

Neither party has addressed this claim. While the Court has doubts as to the viability of this claim based upon the facts before it at this time, nevertheless, defendants have failed to point to the absence of evidence to support this claim.  Accordingly, summary judgment is denied with regard to plaintiff's claim of defamation.

## IV.   Conclusion

In light of the foregoing reasons, the motion for summary judgment submitted on behalf of former Lafayette City Marshal Earl J. "Nickey" Picard and Deputy Marshal Jeffrey Mahler is DENIED [Doc. 50]; the motion for summary judgment submitted on behalf of Lafayette City-Parish Consolidated Government is DENIED [Doc. 51]; and the joint motion to strike the affidavit of Dr. Darrell Henderson submitted on behalf of all defendants is DENIED IN PART and GRANTED IN PART [Doc. 58].

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this ___31st___ day of March, 2015.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE